# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

| | |
|---|---|
| ANDRE GHARIBIAN, individually and on behalf of all others similarly situated,<br><br>     Plaintiff,<br><br>  v.<br><br>LOANCARE, LLC, and FIDELITY NATIONAL FINANCIAL, INC.,<br><br>     Defendants. | Case No.: _____<br><br><br>**DEMAND FOR JURY TRIAL** |

## CLASS ACTION COMPLAINT

Plaintiff Andre Gharibian ("Plaintiff"), by and through his undersigned counsel, files this Class Action Complaint individually and on behalf a class of all similarly situated persons against Defendants LoanCare, LLC, ("LoanCare") and Fidelity National Financial, Inc. ("Fidelity") (collectively "Defendants"). Plaintiff bases the following allegations upon information and belief, investigation of counsel, and his own personal knowledge.

## NATURE OF THE ACTION

1. Plaintiff brings this action against Defendants for their failure to properly secure and safeguard highly valuable, protected, personally identifiable information including, *inter alia*, customers' names, addresses, Social Security

numbers, and loan numbers (collectively, "PII"); and for their failure to comply with industry standards to protect information systems that contain PII.

2.    Fidelity is one of the largest transaction services providers for the real estate and mortgage industries with a market capitalization of approximately $13.3 billion.[1]

3.    Fidelity is the parent company of LoanCare, which is a sub-servicing and interim sub-servicing provider and a significant player in the mortgage servicing sector, handling approximately $390 billion in balances from over a million loans.[2]

4.    As a loan servicing company, LoanCare is responsible for processing loan payments, handling escrow accounts, and generally managing customers' mortgages. In order to obtain LoanCare's services, customers are required to entrust LoanCare with their PII, which LoanCare uses in order to perform its regular loan servicing activities. Upon information and belief, the PII customers entrust to LoanCare is ultimately stored in Fidelity's information technology network.

5.    As financial services companies, Defendants therefore knowingly collect and store sensitive customer PII, and have a resulting duty to secure such information from unauthorized access.

---

[1]  Bill Toulas, *Mortgage firm LoanCare warns 1.3 million people of data breach*, BLEEPINGCOMPUTER (Dec. 27, 2023), https://www.bleepingcomputer.com/news/security/mortgage-firm-loancare-warns-13-million-people-of-data-breach/.
[2] *Id.*

6.      Defendants expressly recognize these duties, representing that they are "committed to protecting [customers'] privacy" and further stated that "[w]e maintain physical, electronic, and procedural safeguards to protect your information."[3]

7.      Despite their duties to safeguard customer PII, on or about November 19, 2023, LoanCare became aware of unauthorized access to parts of its system housed within Fidelity's information technology network. Upon an investigation, Defendants determined that the PII of approximately 1.3 million LoanCare customers had been accessed and exfiltrated by an unauthorized third party (the "Data Breach" or "Breach").

8.      As a direct and proximate result of Defendants' failure to implement and follow basic security procedures, Plaintiff's and Class Members' PII—including names, addresses, Social Security Numbers, and loan numbers—is now in the hands of cybercriminals.

9.      Plaintiff and Class Members are now at a significantly increased and certainly impending risk of fraud, identity theft, and other harms caused by the unauthorized disclosure of their PII—risks which may last for the rest of their lives.

---

[3]    *Fidelity National Financial Privacy Notice*, LOANCARE, https://www.loancareservicing.com/privacy-policy/ (last accessed Jan. 23, 2024).

Consequently, Plaintiff and Class Members must devote substantially more time, money, and energy to protect themselves, to the extent possible, from these crimes.

10.     As such, on behalf of himself and all others similarly situated, Plaintiff brings claims for negligence, negligence *per se*, breach of implied contract, and declaratory judgment, seeking damages and injunctive relief, including the adoption of reasonably sufficient data security practices to safeguard the PII in Defendants' possession in order to prevent incidents like the Data Breach from reoccurring in the future.

## PARTIES

11.     Plaintiff is an adult who at all relevant times is a resident and citizen of the State of California. Plaintiff is a customer who has a mortgage serviced by LoanCare. Plaintiff received a notification from LoanCare informing him that his PII in Defendants' possession was compromised in the Data Breach.

12.     Since the announcement of the Data Breach, Plaintiff has spent approximately 25 hours of his valuable time and effort monitoring his financial accounts, scanning the dark web for his PII, and researching the Data Breach in an attempt to prevent any misuses of his PII. Plaintiff plans on spending additional time monitoring his financial accounts. This is time which Plaintiff would not have to expend but for the Data Breach.

13.    Due to the sensitivity of the PII compromised in the Data Breach, Plaintiff is and will continue to be at heightened and certainly impending risk for fraud and identity theft, and their attendant damages for years to come.

14.    Defendant Fidelity is a Delaware corporation that maintains its principal place of business at 601 Riverside Ave., Building 5, Jacksonville, Florida.

15.    Defendant LoanCare is a Virginia limited liability company that maintains its principal place of business at 3637 Sentara Way, Virginia Beach, Virginia. Upon information and belief, LoanCare is a direct, wholly owned subsidiary of ServiceLink NLS, LLC, who in turn is a direct, wholly owned subsidiary of ServiceLink Holdings, Inc. Upon information and belief, ServiceLink Holdings, Inc. is a direct, wholly owned subsidiary of Fidelity National Financial, Inc.

16.    Defendant LoanCare is a citizen of each state in which one of its members is a citizen. As such, LoanCare is a citizen of the States of Delaware and Florida for the purposes of diversity jurisdiction.

## JURISDICTION AND VENUE

17.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d), the Class Action Fairness Act, because Plaintiff and at least one member of the Class, as defined below, are citizens of a different state than Defendants, there

are more than 100 members of each of the Class, and the aggregate amount in controversy exceeds $5,000,000 exclusive of interests and costs.

18.    This Court has general personal jurisdiction over Defendants because Defendants are citizens of the State of Florida.

19.    This Court is the proper venue for this action pursuant to 28 U.S.C. § 1391(b)(1), because Defendants reside in this District, a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in this District; Defendants conduct substantial business within this District; and Defendants have harmed Class Members residing in this District.

## FACTUAL BACKGROUND

**A.    Defendants Provide Financial Services Involving Highly Sensitive Data.**

20.    Fidelity provides a myriad of services to the real estate and mortgage industries, including title insurance policies, closing and escrow services, and other title-related services.[4]

21.    Through its subsidiary companies, Fidelity provides additional services, including mortgage and real estate services, real estate technology, and annuities and life insurance. One such Fidelity subsidiary is LoanCare.

---

[4] *About Us*, FIDELITY NATIONAL SERVICES, https://fnf.com/who-we-are#About%20Us (last accessed Jan. 23, 2024).

22.    LoanCare "is a nationally recognized leader in full-service subservicing to the mortgage industry."[5] Specifically, LoanCare "services and subservices mortgage loans secured primarily by residential real estate throughout the United States."[6]

23.    LoanCare provides loan servicing solutions to independent mortgage bankers, banks and credit unions, and portfolio investors.[7] In the course of providing its loan servicing solutions, LoanCare subservices more than 1.8 million loans nationwide, totaling over $389 billion in unpaid principal balances.[8]

24.    As part of conducting its loan servicing solutions to other financial institutions, LoanCare is entrusted with mortgage customers' sensitive PII, but not limited to individuals' names, addresses, Social Security Numbers, and loan numbers.

25.    Upon information and belief, the PII LoanCare is entrusted with is ultimately stored on Fidelity's information technology network.

---

[5] *Mortgage & Real Estate Services*, FIDELITY NATIONAL SERVICES, https://fnf.com/companies/mortgage-real-estate-services/#LoanCare (last accessed Jan. 23, 2024).
[6] Fidelity National Financial, Inc., *Form 10-K for Fiscal Year Ended Dec. 31, 2022*, https://www.investor.fnf.com/static-files/09f88722-9b4f-46e1-8a78-88826d6d5968, at p. 36.
[7] *Who We Serve*, LOANCARE, https://www.loancareservicing.com/ (last accessed Jan. 23, 2024).
[8] *Id.*

**B.     The Data Breach.**

26.     On or about November 19, 2023, Fidelity announced that it had been impacted by a "cybersecurity incident."[9]

27.     News articles reported that in response to the cybersecurity incident, Fidelity "decided to shut down their network, systems, and even their email […] in an attempt to scrub their servers in Jacksonville and prevent any issues."[10]

28.     "This virtually froze all the company and its subsidiaries' activities, leaving people buying and selling homes, or paying mortgages, confused and uncertain of what was going to happen to their properties and money."[11]

29.     LoanCare itself called the cybersecurity incident a "catastrophe" in an automated message played to anyone who called its customer support number.[12]

30.     And shortly after the cybersecurity incident, "the ransomware gang known as ALPHV (or BlackCat) claimed responsibility for the cyberattack on FNF in a message posted on the gang's official dark web site."[13]

---

[9] Lorenzo Franceschi-Bicchierai, *Fidelity National Financial shuts down network in wake of cybersecurity incident*, TechCrunch (Nov. 22, 2023), https://techcrunch.com/2023/11/22/fidelity-national-financial-shuts-down-network-in-wake-of-cybersecurity-incident/.

[10] *Id.*

[11] Lorenzo Franceschi-Bicchierai, *After a week-long outage, Fidelity National Financial confirms cyberattack is now 'contained,'* TechCrunch (Nov. 30, 2023), https://techcrunch.com/2023/11/30/after-a-week-long-outage-fidelity-national-financial-confirms-cyberattack-is-now-contained/.

[12] Lorenzo Franceschi-Bicchierai, *Ransomware 'catastrophe' at Fidelity National Financial causes panic with homeowners and buyers*, TechCrunch (Nov. 27, 2023), https://techcrunch.com/2023/11/27/ransomware-catastrophe-at-fidelity-national-financial-causes-panic-with-homeowners-and-buyers/.

[13] *Id.*

31.    Approximately one month later, on or about December 20, 2023, LoanCare filed a notice of data breach ("Notice") with the Attorney General of Maine indicating that the cybersecurity incident was really a cyber-attack that had occurred on or about November 19, 2023.[14]

32.    LoanCare has provided minimal information about the Data Breach, describing the circumstances surrounding the Data Breach as follows:

> On or about November 19, 2023, LoanCare, LLC ("LoanCare"), which performs or has performed loan subservicing functions for your mortgage loan servicer, became aware of unauthorized access to certain systems within its parent's, Fidelity National Financial, Inc. ("FNF"), information technology network. Upon becoming aware of the incident, FNF commenced an investigation with the assistance of third-party experts, notified certain law enforcement and governmental authorities, and began taking measures to assess and contain the incident. The incident has been contained.
>
> The investigation has determined that an unauthorized third party exfiltrated data from certain FNF systems.[15]

33.    Once able to access LoanCare's systems, these malicious third-party hackers stole information including, *inter alia*, individuals' full names, addresses, Social Security numbers, and loan numbers.[16]

---

[14] *Data Breach Notifications*, OFFICE OF THE MAIN ATTORNEY GENERAL, https://apps.web.maine.gov/online/aeviewer/ME/40/25bd9abc-608b-4a8a-8f35-ba5413b9399f.shtml (last accessed Jan. 23, 2024).
[15] *Id.*
[16] Toulas, *supra*, note 1.

34.     In a regulatory filing on or about January 9, 2024, Fidelity later reported that it was able to determine "that an unauthorized third-party accessed certain FNF systems, deployed a type of malware that is not self-propagating, and exfiltrated certain data."[17]

35.     Based on Defendants' statements, it is evident that the bad actors accessed Defendants' computer systems in an intentional attack designed to acquire customers' valuable PII stored therein, and that the bad actors were successful in the attack.

36.     As a result of the Data Breach, the PII of approximately 1.3 million individuals—including Plaintiff and Class Members—was exfiltrated and is now in the hands of cybercriminals.[18]

**C.     Defendants Obtain, Collect, and Store Plaintiff's and Class Members' PII.**

37.     In the ordinary course of doing business with its customers, LoanCare regularly requires Plaintiff and Class Members to provide LoanCare their PII, which in turn is stored on Fidelity's information technology network. This information includes:

---

[17]  Bill Toulas, *Fidelity National Financial: Hackers stole data of 1.3 million people*, BLEEPINGCOMPUTER (Jan. 10, 2024), https://www.bleepingcomputer.com/news/security/fidelity-national-financial-hackers-stole-data-of-13-million-people/.

[18] *Id.*

- Contact information (*e.g.*, name, address, phone number, email address);

- Demographic information (*e.g.*, date of birth, gender, marital status);

- Identity information (*e.g.*, Social Security Number, driver's license, passport, or other government ID number);

- Financial account information (*e.g.*, loan or bank account information); and

- Other personal information necessary to provide products or services.

38. By obtaining, collecting, using, and deriving a benefit from Plaintiff's and Class Members' PII, Defendants assumed legal and equitable duties and knew or should have known that they were responsible for protecting Plaintiff's and Class Members' PII from unauthorized access, compromise, and exfiltration.

39. Defendants expressly recognize these duties, representing that they are "committed to protecting [customers'] privacy" and further stated that "[w]e maintain physical, electronic, and procedural safeguards to protect your information."[19]

---

[19] *Fidelity National Financial Privacy Notice*, LOANCARE, https://www.loancareservicing.com/privacy-policy/ (last accessed Jan. 23, 2024).

40.     Plaintiff and Class Members reasonably expect that financial service providers such as Defendants will use the utmost care to keep this information confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information.

41.     Plaintiff and Class Members had a reasonable expectation, based in part on Defendants' own statements, that their sensitive personal information would be protected. However, despite Defendants' stated commitment to data security, Defendants failed to adopt reasonable measures to prevent the unauthorized access to Plaintiff's and Class Members' PII and allowed for the release of said information to unauthorized bad actors.

42.     Had Defendants maintained their information technology network and worked diligently to correct vulnerabilities, remedied the deficiencies in their information storage and security systems, followed industry guidelines, and adopted security measures recommended by experts in the field, Defendants could have prevented intrusion into their information technology network and, ultimately, the theft of Plaintiff's and Class Members' confidential PII.

**D.   The Value of Private Information and Effects of Unauthorized Disclosure.**

43.     Defendants were well aware that the protected PII which they acquire is highly sensitive and of significant value to those who would use it for wrongful, nefarious purposes.

44.    Defendants also knew that a breach of their computer systems, and exposure of the PII therein, would result in the increased risk of identity theft and fraud against the individuals whose PII was compromised.

45.    These risks are not theoretical, numerous high-profile breaches have occurred at financial services companies such as CapitalOne, KeyBank, Equifax, Flagstar Bank, and TMX Finance Corporate Services in recent years.

46.    PII is a valuable commodity to identity thieves. As the Federal Trade Commission ("FTC") recognizes, identity thieves can use this information to commit an array of crimes including identity theft, and medical and financial fraud.[20] Indeed, a robust "cyber black market" exists in which criminals openly post stolen PII and other protected financial information on multiple underground Internet websites, commonly referred to as the "dark web."

47.    Criminals often trade stolen PII on the "cyber black market" for years following a breach. Cybercriminals can also post stolen PII on the internet, thereby making such information publicly available.

48.    The prevalence of data breaches and identity theft has increased dramatically in recent years, accompanied by a parallel and growing economic drain on individuals, businesses, and government entities in the U.S. In 2021, there were

---

[20] *What To Know About Identity Theft*, FED. TRADE COMM'N CONSUMER ADVICE (Apr. 2021), https://www.consumer.ftc.gov/articles/0271-warning-signs-identity-theft (last accessed Jan 23, 2024).

4,145 publicly disclosed data breaches, exposing 22 billion records. The United States specifically saw a 10% increase in the total number of data breaches.[21]

49.    In tandem with the increase in data breaches, the rate of identity theft complaints has also increased over the past few years. For instance, in 2017, 2.9 million people reported some form of identity fraud compared to 5.7 million people in 2021.[22]

50.    The financial sector is also a prime target for threat actors. Between January 2018 and September 2023, financial companies have suffered 2,260 data breaches, impacting over 232 million records.[23]

51.    The financial sector is "disproportionately targeted by threat actors" because of a simple rational: "[t]hreat actors target organizations that have what they want and what pays big – data and money. Data can be sold for money and vulnerabilities that enable access to both data and money."[24]

---

[21] *Data Breach Report: 2021 Year End*, RISK BASED SECURITY (Feb. 4, 2022), https://www.riskbasedsecurity.com/2022/02/04/data-breach-report-2021-year-end/.

[22] *Insurance Information Institute, Facts + Statistics: Identity theft and cybercrime*, INSURANCE INFORMATION INSTITUTE, https://www.iii.org/fact-statistic/facts-statistics-identity-theft-and-cybercrime#Identity%20Theft%20And%20Fraud%20Reports,%202015-2019%20.

[23] Paul Bischoff, *Financial data breaches accounted for 232 million leaked records from January 2018 to September 2023*, Comparitech (Oct. 4, 2023), https://www.comparitech.com/blog/vpn-privacy/financial-data-breaches/#:~:text=2%2C260%20financial%20data%20breaches%20from,over%20101%20million%20in%20total.

[24] Jen Miller-Osborn, *3 Reasons Cyberattacks Target Financial Services and How to Fight Back*, Paloalto Network (Aug. 31, 2021), https://www.paloaltonetworks.com/blog/2021/08/financial-services-cyberattacks/.

52.    Indeed, "[h]acking financial organizations can potentially allow malicious threat actors to access accounts or personal information that can help a criminal gain unauthorized access and make financial transactions or trick others into revealing more information and sending them money."[25]

53.    The breadth of data compromised in the Data Breach makes the information particularly valuable to thieves and leaves Plaintiff and Class Members especially vulnerable to identity theft, tax fraud, credit and bank fraud, and more.

54.    **Social Security Numbers**—Unlike credit or debit card numbers in a payment card data breach—which can quickly be frozen and reissued in the aftermath of a breach—unique social security numbers cannot be easily replaced. Even when such numbers are replaced, the process of doing so results in a major inconvenience to the subject person, requiring a wholesale review of the person's relationships with government agencies and any number of private companies in order to update the person's accounts with those entities.

55.    The Social Security Administration even warns that the process of replacing a Social Security number is a difficult one that creates other types of problems, and that it will not be a panacea for the affected person:

---

[25] Kyle Chin, *Why is the Finance Sector a Target for Cyber Attacks?*, UpGuard (Aug. 21, 2023), https://www.upguard.com/blog/finance-sector-cyber-attacks#:~:text=Hacking%20financial%20organizations%20can%20potentially,information%20and%20sending%20them%20money.

Keep in mind that a new number probably will not solve all your problems. This is because other governmental agencies (such as the IRS and state motor vehicle agencies) and private businesses (such as banks and credit reporting companies) likely will have records under your old number. Along with other personal information, credit reporting companies use the number to identify your credit record. So using a new number will not guarantee you a fresh start. This is especially true if your other personal information, such as your name and address, remains the same.

If you receive a new Social Security Number, you should not be able to use the old number anymore.

For some victims of identity theft, a new number actually creates new problems. If the old credit information is not associated with your new number, the absence of any credit history under the new number may make more difficult for you to get credit.[26]

56.    Social Security Numbers allow individuals to apply for credit cards, student loans, mortgages, and other lines of credit—among other services. Often social security numbers can be used to obtain medical goods or services, including prescriptions. They are also used to apply for a host of government benefits. Access to such a wide range of assets makes social security numbers a prime target for cybercriminals and a particularly attractive form of PII to steal and then sell.

57.    The ramifications of Defendants' failure to keep Plaintiff's and Class Members' PII secure are long-lasting and severe. Once PII is stolen, fraudulent use of that information and damage to victims may continue for years.

---

[26] *Identify Theft and Your Social Security Numbers*, Social Security Admin. (June 2021), https://www.ssa.gov/pubs/EN-05-10064.pdf.

58.    A data breach increases the risk of becoming a victim of identity theft. Victims of identity theft can suffer from both direct and indirect financial losses. According to a research study published by the Department of Justice:

> A direct financial loss is the monetary amount the offender obtained from misusing the victim's account or personal information, including the estimated value of goods, services, or cash obtained. It includes both out-of-pocket loss and any losses that were reimbursed to the victim. An indirect loss includes any other monetary cost caused by the identity theft, such as legal fees, bounced checks, and other miscellaneous expenses that are not reimbursed (e.g., postage, phone calls, or notary fees). All indirect losses are included in the calculation of out-of-pocket loss.[27]

59.    Even if stolen PII does not include financial or payment card account information does not mean there has been no harm, or that the breach does not cause a substantial risk of identity theft. Freshly stolen information can be used with success against victims in specifically targeted efforts to commit identity theft known as social engineering or spear phishing. In these forms of attack, the criminal uses the previously obtained PII about the individual, such as name, address, email address, and affiliations, to gain trust and increase the likelihood that a victim will be deceived into providing the criminal with additional information.

---

[27] Erika Harrell, *Bureau of Just. Stat.*, U.S. DEP'T OF JUST., NCJ 256085, *Victims of Identity Theft*, 2018 I (2020) https://bjs.ojp.gov/content/pub/pdf/vit18.pdf (last accessed Jan. 23, 2024).

60.    A poll of security executives predicted an increase in attacks over the next two years from "social engineering and ransomware" as nation-states and cybercriminals grow more sophisticated. Unfortunately, these preventable causes will largely come from "misconfigurations, human error, poor maintenance, and unknown assets."[28]

61.    Due to high-profile data breaches at other companies, Defendants knew or should have known that their information technology system would be targeted by cybercriminals.

62.    Defendants also knew or should have known the importance of safeguarding the PII with which they were entrusted and of the foreseeable consequences if its data security systems were breached. Defendants failed, however, to take adequate cybersecurity measures to prevent the Data Breach and the exfiltration of its customers' PII from occurring.

**E.    Defendants Failed to Comply with FTC Guidelines and Industry Best Practices.**

63.    Defendants are prohibited by the Federal Trade Commission Act, 15 U.S.C. § 45 ("FTC Act") from engaging in "unfair or deceptive acts or practices in or affecting commerce." The FTC has concluded that a company's failure to

---

[28] Chuck Brooks, *Alarming Cyber Statistics For Mid-Year 2022 That You Need to Know*, FORBES (June 3, 2022), https://www.forbes.com/sites/chuckbrooks/2022/06/03/alarming-cyber-statistics-for-mid-year-2022-that-you-need-to-know/?sh=176bb6887864.

maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of the FTC Act.

64.    The FTC has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.[29]

65.    The FTC recommends that businesses:[30]

a.    Identify all connections to the computers where sensitive information is stored;

b.    Assess the vulnerability of each connection to commonly known or reasonably foreseeable attacks;

c.    Do not store sensitive consumer data on any computer with an internet connection unless it is essential for conducting their business;

d.    Scan computers on their network to identify and profile the operating system and open network services. If services are not needed, they should be disabled to prevent hacks or other

---

[29] *Start with Security: A Guide for Business*, U.S. Federal Trade Comm'n (2015), https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf.

[30] *Protecting Personal Information: A Guide for Business*, U.S. Federal Trade Comm'n (2016), https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf.

potential security problems. For example, if email service or an internet connection is not necessary on a certain computer, a business should consider closing the ports to those services on that computer to prevent unauthorized access to that machine;

e.     Pay particular attention to the security of their web applications—the software used to give information to visitors to their websites and to retrieve information from them. Web applications may be particularly vulnerable to a variety of hack attacks;

f.     Use a firewall to protect their computers from hacker attacks while it is connected to a network, especially the internet;

g.     Determine whether a border firewall should be installed where the business's network connects to the internet. A border firewall separates the network from the internet and may prevent an attacker from gaining access to a computer on the network where sensitive information is stored. Set access controls—settings that determine which devices and traffic get through the firewall—to allow only trusted devices with a legitimate business need to access the network. Since the protection a firewall provides is

only as effective as its access controls, they should be reviewed periodically;

h.  Monitor incoming traffic for signs that someone is trying to hack in. Keep an eye out for activity from new users, multiple log-in attempts from unknown users or computers, and higher-than-average traffic at unusual times of the day; and

i.  Monitor outgoing traffic for signs of a data breach. Watch for unexpectedly large amounts of data being transmitted from their system to an unknown user. If large amounts of information are being transmitted from a business's network, the transmission should be investigated to make sure it is authorized.

66.    The FTC further recommends business take additional cybersecurity steps, which include:[31]

a.  Conducting an inventory of all company devices that store sensitive data, and understanding what types of PII is stored on those devices;

---

[31] *Protecting Personal Information: A Guide for Business*, U.S. Federal Trade Comm'n (2016), https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf.

b.    Encrypting sensitive personal information stored on computer networks so that it is unreadable even if hackers are able to gain access to the information;

c.    Crafting a data security plan that involves both physical security (*e.g.*, locking up physical files) and electronic security, and training employees regarding the data security plan.

d.    Promptly disposing of PII that is no longer needed, and retaining sensitive data only as long as companies maintain a legitimate business need for the information; and

e.    Developing a plan to handle a data breach or data security incident, if and when such an incident occurs.

67.    The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTC Act. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

68.    Upon information and belief, Defendants failed to properly implement one or more of the basic data security practices described above. Defendants' failure to employ reasonable and appropriate measures to protect against unauthorized

access to consumer PII resulted in the unauthorized access to and exfiltration of Plaintiff's and Class Members' PII.

69.     Defendants' failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data constitutes an unfair act of practice prohibited by Section 5 of the FTC Act.

70.     Similarly, the U.S. Government's National Institute of Standards and Technology ("NIST") provides a comprehensive cybersecurity framework that companies of any size can use to evaluate and improve their information security controls.[32]

71.     NIST publications include substantive recommendations and procedural guidance pertaining to a broad set of cybersecurity topics including risk assessments, risk management strategies, access controls, training, data security controls, network monitoring, breach detection, and incident response.[33] Upon information and belief, Defendants failed to adhere to the NIST guidance.

72.     Further, cybersecurity experts have identified various best practices that should be implemented by entities in the financial industry, including the following:

---

[32] *See Framework for Improving Critical Infrastructure Cybersecurity*, NATIONAL INSTITUTE OF STANDARDS AND TECHNOLOGY (April 16, 2018), Appendix A, Table 2, https://nvlpubs.nist.gov/nistpubs/cswp/nist.cswp.04162018.pdf.
[33] *Id.* at Table 2 pg. 26-43.

a.    Regularly assessing risks and auditing cybersecurity;

b.    Establishing a cybersecurity policy;

c.    Appointing a data protection officer;

d.    Securing networks;

e.    Verifying user identities;

f.    Establishing secure password management;

g.    Continuously monitor user activity; and

h.    Manage third-party risks.[34]

73.    Upon information and belief, Defendants' failure to protect Plaintiff's and Class Members' PII is a result of their failure to adopt reasonable safeguards as required by the FTC, NIST, and industry best practices.

74.    Defendants were, at all times, fully aware of their obligations to protect the PII of consumers because of their business model of collecting PII to provide financial services. Defendants were also aware of the significant repercussions that would result from its failure to do so.

**F.    Defendants are Subject to, and Failed to Comply with, the GLBA.**

75.    The Gramm-Leach-Bliley Act ("GLBA"), states that "[i]t is the policy of the Congress that each financial institution has an affirmative and continuing

---

[34] *12 Best Practices for Banking and Financial Cybersecurity Compliance*, Ekran (July 17, 2023), https://www.ekransystem.com/en/blog/banking-and-financial-cyber-security-compliance.

obligation to respect the privacy of its customers and to protect the security and confidentiality of those customers' nonpublic personal information." 15 U.S.C. § 6801(a).

76.    A "financial institution" is defined as "any institution the business of which is engaging in financial activities as described in section 1843(k) of title 12." 15 U.S.C. § 6809(3)(A). Defendants are considered a financial institution for purposes of the GLBA as Defendants offer consumers financial products and/or services loans.[35] *See* 12 U.S.C. § 1843(k)(4).

77.    "Nonpublic personal information" means "personally identifiable financial information provided by a consumer to a financial institution; resulting from any transaction with the consumer or any service performed for the consumer; or otherwise obtained by the financial institution." 15 U.S.C. § 6809(4)(A)(i)–(iii). The PII involved in the Data Breach constitutes "nonpublic personal information" for purposes of the GLBA.

78.    Defendants collect "nonpublic personal information," as defined by 15 U.S.C. § 6809(4)(A), 16 C.F.R. § 313.3(n) & 12 C.F.R. § 1016.3(p)(1). Accordingly, during the relevant time period, Defendants were subject to the requirements of the

---

[35] Defendants acknowledge that they are subject to the GLBA. *See* Fidelity National Financial, *Code of Business Conduct & Ethics* (Feb. 2023), https://www.investor.fnf.com/static-files/0a78d41c-b0d8-4fc6-847a-dab5340915ac, at p. 9 (acknowledging "[t]he Safeguards Rule, implemented as part of the Gramm-Leach-Bliley Act, and other federal and state laws and regulations provide specific guidelines regarding the privacy, protection and security of customers' personally identifiable information").

GLBA, 15 U.S.C. §§ 6801, *et seq*., and are subject to numerous rules and regulations promulgated under the GLBA.

79.    The Safeguards Rule, which implements Section 501(b) of the GLBA, 15 U.S.C. § 6801(b), requires financial institutions to protect the security, confidentiality, and integrity of customer information by developing a comprehensive written information security program that contains reasonable administrative, technical, and physical safeguards, including: (1) designating one or more employees to coordinate the information security program; (2) identifying reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of customer information, and assessing the sufficiency of any safeguards in place to control those risks; (3) designing and implementing information safeguards to control the risks identified through risk assessment, and regularly testing or otherwise monitoring the effectiveness of the safeguards' key controls, systems, and procedures; (4) overseeing service providers and requiring them by contract to protect the security and confidentiality of customer information; and (5) evaluating and adjusting the information security program in light of the results of testing and monitoring, changes to the business operation, and other relevant circumstances. 16 C.F.R. §§ 314.3 & 314.4. As alleged herein, Defendants violated the Safeguards Rule.

80.    Defendants' conduct resulted in a variety of failures to follow GLBA mandated rules and regulations, many of which are also industry standard. Among such deficient practices, the Data Breach demonstrates that Defendants failed to implement (or inadequately implemented) information security policies or procedures such as effective employee training, adequate intrusion detection systems, regular reviews of audit logs and records, and other similar measures to protect the confidentiality of the PII they maintained in their information technology network.

81.    Had Defendants implemented data security protocols, the consequences of the Data Breach could have been avoided, or at least significantly reduced as the Data Breach could have been detected earlier, the amount of PII compromised could have been greatly reduced.

**G.    Plaintiff and Class Members Suffered Damages.**

82.    The ramifications of Defendants' failure to keep consumers' PII secure are long-lasting and severe. Defendants' conduct, which allowed the Data Breach to occur, caused Plaintiff and Class Members significant injuries and harm in several ways, including theft of their PII as well as substantial and imminent risk of identity theft and fraud. Plaintiff and Class Members must immediately devote time, energy, and money to: (1) closely monitor their bills, records, and credit and financial accounts; (2) change login and password information on any sensitive account even

more frequently than they already do; (3) more carefully screen and scrutinize phone calls, emails, and other communications to ensure that they are not being targeted in a social engineering, spear phishing, or extortion attacks; and (4) search for suitable identity theft protection and credit monitoring services, and pay to procure them.

83.    In 2019, the United States Government Accountability Office ("GAO") released a report addressing the steps consumers can take after a data breach.[36] Its appendix of steps consumers should consider, in extremely simplified terms, continues for five pages. In addition to explaining specific options and how they can help, one column of the chart explains the limitations of the consumers' options. It is clear from the GAO's recommendations that the steps data breach victims (like Plaintiff and Class Members) must take after a data breach, like Defendants', are both time-consuming and of only limited and short-term effectiveness.

84.    The FTC, like the GAO, recommends that identity theft victims take several steps to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges

---

[36] Government Accountability Off., *Data Breaches* (Mar. 2019) https://www.gao.gov/assets/gao-19-230.pdf (last accessed Jan. 22, 2024).

from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[37]

85.    LoanCare itself recognizes the certainly impending and increased risk of identity theft and fraud that Plaintiff and Class Members now face as it has offered its current and former customers who were impacted by the Data Breach twenty-four months of identity protection services and further advised those individuals to remain "especially vigilant" against incidents of identity theft and fraud, to "regularly review" their account statements, periodically obtain their credit reports, and "promptly report" incidents of suspected identity theft to their financial institutions.  and to monitor your credit reports for suspicious activity."[38]

86.    Further, once PII is exposed, there is virtually no way to ensure that the exposed information has been fully recovered or obtained against future misuse.

87.    It must also be noted there may be a substantial time lag—measured in years—between when harm occurs versus when it is discovered, and also between when PIIs stolen and when it is used. According to the GAO, which has conducted studies regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web,

---

[37] *See Identity Theft Victim Checklist*, Fed. Trade Comm'n, https://www.identitytheft.gov/Steps (last accessed Jan. 5, 2024).

[38] *Data Breach Notifications*, OFFICE OF THE MAINE ATTORNEY GENERAL (Dec. 20, 2023), https://apps.web.maine.gov/online/aeviewer/ME/40/25bd9abc-608b-4a8a-8f35-ba5413b9399f.shtml.

fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[39]

88.    For these reasons, Plaintiff and Class Members will need to maintain these heightened measures for years, and possibly their entire lives as a result of Defendants' conduct.

89.    Further, the value of Plaintiff's and Class Members' PII has been diminished by its exposure in the Data Breach. Indeed, PII is a valuable commodity to identity thieves, and, once it has been compromised, criminals will use them and trade the information on the cyber black market for years thereafter.[40]

90.    The reality is that cybercriminals seek nefarious outcomes from a data breach, and stolen PII can be used to carry out a variety of crimes.

91.    Plaintiff and Class Members are also at a continued risk because their information remains in Defendants' systems, which have already been shown to be susceptible to compromise and attack and is subject to further attack so long as Defendants' fail to undertake the necessary and appropriate security and training measures to protect its customers' PII.

92.    As a result of Defendants' failures, Plaintiff and Class Members face an increased risk of identity theft and fraud, phishing attacks, and related

---

[39] *See* 2007 GAO Report, at 29.
[40] *The Price Cybercriminals Charge for Stolen Data*, Trustwave (Aug. 6, 2023), https://www.trustwave.com/en-us/resources/blogs/spiderlabs-blog/the-price-cybercriminals-charge-for-stolen-data/.

cybercrimes because of the Data Breach. Those impacted are under heightened and prolonged anxiety and fear, as they will be at risk of falling victim to cybercrimes for years to come.

93.    Plaintiff and Class Members have suffered emotional distress as a result of the Data Breach, the increased risk of identity theft and financial fraud, and the unauthorized exposure of their private information to strangers and cybercriminals.

## CLASS ALLEGATIONS

94.    Plaintiff brings this case individually and, pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of the class defined as:

> All individuals in the United States whose PII was compromised in the LoanCare Data Breach which was announced on or about December 20, 2023 (the "Class").

95.    Excluded from the Class are Defendants, their subsidiaries and affiliates, their officers, directors, and members of their officers' and directors' immediate families, any entity in which Defendants have a controlling interest, the legal representative, heirs, successors, or assigns of any such excluded party, the judicial officer(s) to whom this action is assigned, and the members of those judicial officers' immediate families.

96.    Plaintiff reserves the right to modify or amend the definition of the proposed Class prior to moving for class certification.

97.    **Numerosity.** The class described above is so numerous that joinder of all individual members in one action would be impracticable. The disposition of the individual claims of the respective Class Members through this class action will benefit both the parties and this Court. The exact size of the Class and the identities of the individual members thereof are ascertainable through Defendants' records, including but not limited to, the files implicated in the Data Breach. Based upon public filings, the number of people impacted is approximately 1.3 million.

98.    **Commonality.** This action involves questions of law and fact that are common to the Class Members. Such common questions include, but are not limited to:

- Whether and to what extend Defendants had a duty to protect the PII of Plaintiff and Class Members;

- Whether Defendants were negligent in collecting and storing Plaintiff's and Class Members' PII;

- Whether Defendants had duties not to disclose the PII of Plaintiff and Class Members to unauthorized third parties;

- Whether Defendants took reasonable steps and measures to safeguard Plaintiff's and Class Members' PII;

- Whether Defendants failed to adequately safeguard the PII of Plaintiff and Class Members;

- Whether Defendants breached their duties to exercise reasonable care in handling Plaintiff's and Class Members' PII;

- Whether Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

- Whether Plaintiff and Class Members are entitled to damages as a result of Defendants' wrongful conduct; and

- Whether Plaintiff and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Data Breach.

99.  **Typicality.** Plaintiff's claims are typical of the claims of the Class Members. The claims of Plaintiff and Class Members are based on the same legal theories and arise from the same failure by Defendants to safeguard their PII. Plaintiff and Class Members entrusted Defendants with their PII, and it was subsequently released to an unauthorized third party.

100.  **Adequacy of Representation.** Plaintiff is an adequate representative of the Class because his interests do not conflict with the interests of the other Class Members Plaintiff seeks to represent; Plaintiff has retained counsel competent and experienced in complex class action litigation; Plaintiff intends to prosecute this

action vigorously; and Plaintiff's counsel has adequate financial means to vigorously pursue this action and ensure the interests of the Class will not be harmed. Furthermore, the interests of the Class Members will be fairly and adequately protected and represented by Plaintiff and Plaintiff's counsel.

101.    **Superiority.** This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy and joinder of all members of the Class is impracticable. This proposed class action presents fewer management difficulties than individual litigation, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. Class treatment will create economies of time, effort, and expense and promote uniform decision-making.

102.    **Predominance.** Common questions of law and fact predominate over any questions affecting only individual Class members. Similar or identical violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that dominate this action. For example, Defendants' liability and the fact of damages is common to Plaintiff and each member of the Class. If Defendants breached their duties and released Plaintiff's and Class Members' PII, then Plaintiff and each Class member suffered damages by that conduct.

103.  **Ascertainability:** Members of the Class are ascertainable. Class membership is defined using objective criteria, and Class Members may be readily identified through Defendants' books and records.

**FIRST CAUSE OF ACTION**
**NEGLIGENCE**
**(On Behalf of Plaintiff and the Class)**

104.  Plaintiff restates and realleges the allegations contained in paragraphs 1 through 103 as if fully set forth herein.

105.  Defendants owed a duty under common law to Plaintiff and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting their PII in Defendants' possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons.

106.  Specifically, this duty included, among other things: (a) designing, maintaining, and testing Defendants' security systems to ensure that Plaintiff's and Class Members' PII in Defendants' possession was adequately secured and protected; (b) implementing processes that would detect a breach of their security system in a timely manner; (c) timely acting upon warnings and alerts, including those generated by its own security systems, regarding intrusions to its networks; and (d) maintaining data security measures consistent with industry standards.

107.  Defendants' duty to use reasonable care arose from several sources, including but not limited to those described below.

108.   Defendants had a common law duty to prevent foreseeable harm to others. This duty existed because Plaintiff and Class Members were the foreseeable and probable victims of any inadequate security practices on the part of Defendants. By collecting and storing valuable PII that is routinely targeted by criminals for unauthorized access, Defendants were obligated to act with reasonable care to protect against these foreseeable threats.

109.   Defendants also owed a common law duty because their conduct created a foreseeable risk of harm to Plaintiff and Class Members. Defendants' conduct included their failure to adequately restrict access to its computer networks and/or servers that held individuals' PII.

110.   Defendants also knew or should have known of the inherent risk in collecting and storing massive amounts of PII, the importance of implementing adequate data security measures to protect that PII, and the frequency of cyberattacks such as the Data Breach in the financial sector.

111.   Defendants breached the duties owed to Plaintiff and Class Members and thus were negligent. Defendants breached these duties by, among other things: (a) mismanaging its system and failing to identify reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of customer information that resulted in the unauthorized access and compromise of PII; (b) mishandling its data security by failing to assess the sufficiency of its safeguards in

place to control these risks; (c) failing to design and implement information safeguards to control these risks; (d) failing to adequately test and monitor the effectiveness of the safeguards' key controls, systems, and procedures; (e) failing to evaluate and adjust their information security program in light of the circumstances alleged herein; (f) failing to detect the breach at the time it began or within a reasonable time thereafter; (g) failing to follow their own privacy policies provided to customers; and (h) failing to adequately train and supervise employees and third party vendors with access or credentials to systems and databases containing sensitive PII.

112.   But for Defendants' wrongful and negligent breach of their duties owed to Plaintiff and Class Members, their PII would not have been access, exfiltrated, and compromised by cybercriminals.

113.   As a direct and proximate result of Defendants' negligence, Plaintiff and Class Members have suffered injuries including:

a.   Theft of their PII;

b.   Costs associated with requesting credit freezes;

c.   Costs associated with the detection and prevention of identity theft;

d.   Costs associated with purchasing credit monitoring and identity theft protection services;

e.   Lowered credit scores resulting from credit inquiries following fraudulent activities;

f.   Costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate, and deal with the actual and future consequences of the Data Breach;

g.   The imminent and certainly impending injury flowing from potential fraud and identity theft posed by their PII being placed in the hands of criminals;

h.   Damages to and diminution in value of their PII entrusted to LoanCare and Fidelity with the mutual understanding that Defendants would safeguard Plaintiff's and Class Members' data against theft and not allow access and misuse of their data by others; and

i.   Continued risk of exposure to hackers and thieves of their PII, which remains in Defendants' possession and is subject to further breaches so long as Defendants fail to undertake appropriate and adequate measures to protect Plaintiff and Class Members.

114.   As a direct and proximate result of Defendants' negligence, Plaintiff and Class Members are entitled to damages, including compensatory, punitive, and/or nominal damages, in an amount to be proven at trial.

**SECOND CAUSE OF ACTION**
**NEGLIGENCE *PER SE***
**(On Behalf of Plaintiff and the Class)**

115.   Plaintiff restates and realleges the allegations contained in paragraphs 1 through 103 as if fully set forth herein.

116.   Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce" including, as interpreted and enforced by the FTC, the unfair act or practice by companies such as Fidelity and LoanCare for failing to use reasonable measures to protect PII. Various FTC publications and orders also form the basis of Defendants' duties.

117.   Defendants violated Section 5 of the FTC Act by failing to use reasonable measures to protect customers' PII and not complying with the industry standards. Defendants' conduct was particularly unreasonable given the nature and amount of PII they obtained and stored and the foreseeable consequences of a data breach.

118.   Plaintiff and Class Members are consumers within the class of persons Section 5 of the FTC Act was intended to protect.

119.    Moreover, the harm that has occurred is the type of harm that the FTC Act was intended to guard against. Indeed, the FTC has pursued over fifty enforcement actions against businesses which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm suffered by Plaintiff and Class Members.

120.    Defendants' violation of Section 5 of the FTC Act constitutes negligence *per se*.

121.    The GLBA states "that each financial institution has an affirmative and continuing obligation to respect the privacy of its customers and to protect the security and confidentiality of those customers' nonpublic personal information." 15 U.S.C. § 6801(a).

122.    Defendants violated the GLBA and the Safeguards Rule by failing to use reasonable measures to protect PII and not complying with the industry standards. Defendants' conduct was particularly unreasonable given the nature and amount of PII it obtained and disclosed and the foreseeable consequences of a data breach.

123.    Plaintiffs and Class Members are consumers within the class of persons the GLBA and the Safeguards Rule was intended to protect.

124.    Moreover, the harm that has occurred is the type of harm that the GLBA and the Safeguards Rule were intended to guard against.

40

125.   As a direct and proximate result of Defendants' negligence, Plaintiff and Class Members have suffered injuries, including those identified in paragraph 113 above.

126.   As a direct and proximate result of Defendants' negligence, Plaintiff and Class Members have been injured as described herein and above, and are entitled to damages, including compensatory, punitive, and nominal damages, in an amount to be proven at trial.

### THIRD CAUSE OF ACTION
### DECLARATORY JUDGMENT
### (On Behalf of Plaintiff and the Class)

127.   Plaintiff restates and realleges the allegations contained in paragraphs 1 through 103 as if fully set forth herein.

128.   Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq*., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and to grant further necessary relief. Furthermore, the Court has broad authority to restrain acts that are tortious and violate the terms of the federal laws and regulations described herein.

129.   An actual controversy has arisen in the wake of the Data Breach regarding Plaintiff's and Class Members' PII and whether Defendants are currently maintaining data security measures adequate to protect Plaintiff and Class Members from further data breaches that compromise their PII. Plaintiff alleges that

Defendants still possess Plaintiff's and Class Members' PII, and that Defendants' data security measures remain inadequate. Furthermore, Plaintiff and Class Members continue to suffer injury as a result of the compromise of their PII and remains at imminent risk that further compromises of their PII will occur in the future.

130.    Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

   a. Defendants owe a legal duty to secure consumers' PII under the common law Section 5 of the FTC Act, and the GBLA; and

   b. Defendants continue to breach this legal duty by failing to employ reasonable data security measures to safeguard Plaintiff's and Class Members' PII.

131.    This Court also should issue corresponding prospective injunctive relief requiring Defendants to employ adequate security protocols consistent with law and industry standards to protect consumers' PII in their possession.

132.    If an injunction is not issued, Plaintiff and Class Members will suffer irreparable injury, and lack an adequate legal remedy, in the event of another data breach at LoanCare and Fidelity. The risk of another such breach is real, immediate, and substantial. If another breach at LoanCare and Fidelity occurs, Plaintiff and Class Members will not have an adequate remedy at law because many of the

resulting injuries are not readily quantified, and they will be forced to bring multiple lawsuits to rectify the same conduct.

133.    The hardship to Plaintiff and Class Members if an injunction is not issued exceeds the hardship to Defendants if an injunction is issued. Plaintiff and Class Members will likely be subjected to substantial identity theft and other damage. On the other hand, the cost to Defendants of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and Defendants have a pre-existing legal obligation to employ such measures.

134.    Issuance of the requested injunction will not disserve the public interest. On the contrary, such an injunction would benefit the public by preventing another data breach at Defendants, thus eliminating the additional injuries that would result to Plaintiff and consumers whose confidential information would be further compromised.

## **PRAYER FOR RELIEF**

WHEREFORE Plaintiff, on behalf of himself and all others similarly situated, prays for relief as follows:

A.    For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as representative of the Class and Plaintiff's attorneys as Class Counsel to represent the Class;

B.  For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

C.  For damages in an amount to be determined by the trier of fact;

D.  For an order of restitution and all other forms of equitable monetary relief;

E.  Declaratory and injunctive relief as described herein;

F.  Awarding Plaintiff's reasonable attorneys' fees, costs, and expenses;

G.  Awarding pre- and post-judgment interest on any amounts awarded; and,

H.  Awarding such other and further relief as may be just and proper.

## <u>JURY TRIAL DEMANDED</u>

A jury trial is demanded on all claims so triable.

Dated: February 1, 2024

Respectfully submitted,

*/s/ Jeff Ostrow*
Jeff Ostrow, (FL Bar No. 121452)
KOPELOWITZ OSTROW P.A.
One West Las Olas Boulevard
Suite 500
Fort Lauderdale, Florida 33301
Ph:  954-525-4100
ostrow@kolawyers.com

Patrick D. Donathen (*pro hac vice* forthcoming)
**LYNCH CARPENTER LLP**

44

1133 Penn Avenue, 5th Floor
Pittsburgh, PA 15222
Telephone: (412) 322-9243
patrick@lcllp.com
*Attorneys for Plaintiff and the Class*